**GUCOVSCHI ROZENSHTEYN, PLLC**
Adrian Gucovschi (State Bar No. 360988)
140 Broadway, 46th Floor
New York, New York 10005
Telephone: (212) 884-4230
E-Mail: adrian@gr-firm.com

*Attorneys for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Steven Teilmann, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Ultimate Guitar USA LLC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>(1) UNFAIR COMPETITION<br>(2) CONVERSION<br>(3) FALSE ADVERTISING<br>(4) VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT<br>(5) UNJUST ENRICHMENT / RESTITUTION<br>(6) NEGLIGENT MISREPRESENTATION<br>(7) FRAUD<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Steven Teilmann ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Ultimate Guitar USA LLC. ("Ultimate Guitar" or "Defendant").  Plaintiff makes the following allegations pursuant to the investigation of his counsel and upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## **INTRODUCTION**

1.      This is a putative class action lawsuit against Defendant for engaging in an illegal "automatic renewal" scheme with respect to its subscription plans for Ultimate Guitar software products and services that are available exclusively to consumers who enroll in Defendant's auto-renewal membership programs (collectively, the "Ultimate Guitar Subscriptions," enumerated below) through its website at www.Ultimate-Guitar.com (the "Website").  Defendant is a leading industry music instrument platform that offers a wide range of courses and song tracks, including chords, tabs, and lyrics. The Ultimate Guitar Subscriptions provide consumers with access to a broader range of features than are unavailable through free membership, including exclusive access to additional tools and features.  Relevant to Plaintiff's allegations, when consumers sign up for the Ultimate Guitar Subscriptions, Defendant surreptitiously enrolls consumers into a program that automatically renews the Ultimate Guitar Subscriptions from month-to-month or year-to-year resulting in monthly or annual charges to the consumer's credit card, debit card, or third-party payment account ("Payment Method").  In doing so, Defendant fails to provide the requisite disclosures and authorizations required to be made to California consumers under California's Automatic Renewal Law ("ARL"), Cal. Bus. Prof. Code §§ 17600, *et seq.*

2.      Defendant markets, advertises, and sells paid memberships to the Ultimate Guitar Subscriptions through the Website, which include, without limitation, automatic renewal programs

for the following platforms Ultimate Guitar Pro,[1] Ultimate Guitar Courses,[2] and Ultimate Guitar Songbooks[3]—collectively, the ("Ultimate Guitar Subscriptions").

3.    Consumers can sign up for Defendant's Ultimate Guitar Subscriptions through the Website.  To do so, consumers provide Defendant with their billing information, and Defendant then automatically charges its customers' Payment Method as payments are due on a monthly or yearly basis. Defendant is then able to unilaterally charge its customers renewal fees without their consent, as it is in possession of its customers' Payment Method.  Thus, Defendant has made the deliberate decision to charge Plaintiff and other similarly situated customers on a recurring basis, relying on consumer confusion and inertia to retain customers, combat consumer churn, and bolster its revenues.

4.    Pursuant to the ARL, online retailers who offer automatically renewing subscriptions to California consumers must: (i) provide the complete automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent prior to completion of the enrollment process, *see* Cal. Bus. Prof. Code § 17602(a)(1); (ii) obtain consumers' affirmative consent prior to charging their Payment Methods in connection with the subscriptions, *see id*. § 17602(a)(2); and (iii) provide an acknowledgment that includes the

---

[1] Ultimate Guitar Pro is offered as a comprehensive standalone subscription that provides access to enhanced guitar learning tools and exclusive content for musicians and guitar enthusiasts. It offers interactive tabs, official music notation, video tutorials, and practice tools designed to help users master their favorite songs and improve their guitar skills. The subscription automatically renews for approximately $24.99 per month or $99.99 per year.

[2] Ultimate Guitar Courses is offered as a separate, standalone subscription service distinct from the Pro membership. Using Ultimate Guitar Courses, users can access over 2,500 licensed educational courses covering various skill levels, instruments, and musical topics including guitar techniques, chord progressions, scales, and songwriting. The subscription provides unlimited access to more than 1,500 courses and downloadable additional course materials. The subscription automatically renews for $19.99 per month or $59.99 per year.

[3] Ultimate Guitar Songbooks is offered as a separate, standalone subscription service distinct from the Pro membership. It provides users with a database of online versions of books that currently consists of more than 2,000 songbooks available online. The service provides navigation through search and browse functionality, allowing users to choose by instrument, genre, author, and other filter. The subscription automatically renews for approximately $19.99 per month or $59.99 per year.

automatic renewal offer terms and identifies a cost-effective, timely, and easy-to-use mechanism for consumers to cancel their subscriptions, *see id*. §§ 17602(a)(3), 17602(c).

5.      Consumers who purchase the Ultimate Guitar Subscriptions do so either by (a) opting into a seven-day free trial which automatically renews as a paid yearly subscription (charged monthly) at the end of the trial period, (b) a paid monthly subscription, or (c) a paid yearly subscription.  As discussed in greater detail below, the enrollment process for Ultimate Guitar Subscriptions on the Website uniformly violates each of the core requirements of the ARL.  Defendant also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Ultimate Guitar Subscriptions.

6.      Specifically, Defendant systematically violates the ARL by: (i) failing to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement is fulfilled, in violation of Section 17602(a)(1); (ii) charging consumers' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Section 17602(a)(2); and (iii) failing to provide an acknowledgment that includes the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in direct violation of Section 17602(a)(3). *See* Cal. Bus. & Prof. Code §§ 17602(a)(1)-(3); *see also id.* § 17601(b)(1)-(5) (setting forth the definition of "automatic renewal offer terms" as used in Cal. Bus. Prof. Code § 17602(a)).  The acknowledgment email also fails to disclose a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation. In fact, Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Ultimate Guitar Subscriptions, in violation of Section 17602(c) of the ARL.

7.      As a result, Defendant's Ultimate Guitar Subscriptions are deemed to be "unconditional gifts" under the ARL, entitling Plaintiff and the Class to restitution.  *See* Cal. Bus. & Prof. Code § 17603.

8.      For the foregoing reasons, Plaintiff brings this action individually and on behalf of all California subscribers of any of Defendant's Ultimate Guitar Subscriptions who, within the

1  applicable statute of limitations period up to and including the date of judgment in this action,

2  incurred unauthorized fees for the renewal of their Ultimate Guitar Subscriptions.  Based on

3  Defendant's unlawful conduct, Plaintiff seeks damages, restitution, declaratory relief, injunctive

4  relief, and reasonable attorneys' fees and costs, for: (1) violation of California's Unfair

5  Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (2) conversion; (3) violation

6  of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*.; (4)

7  violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et*

8  *seq*.; (5) unjust enrichment/restitution; (6) negligent misrepresentation; and (7) fraud.

9  ## THE PARTIES

10  9.    Plaintiff Steven Teilmann is a citizen of California, residing in San Fransico,

11  California. Plaintiff Teilmann has been an Ultimate Guitar subscriber since May of 2024, when he

12  started a free 7-day trial of the Ultimate Guitar Pro Subscription. At the end of the free trial,

13  Ultimate Guitar automatically charged him a subscription fee of $99.99. Upon noticing the charges

14  to his credit card, on June 9, 2024, Plaintiff Teilmann attempted to cancel the Ultimate Guitar

15  subscription and request a refund. Defendant refused to grant Plaintiff Teilmann a refund but

16  instead offered to convert his subscription into a monthly subscription or to keep his yearly

17  subscription at a discount. Dissatisfied with the alternatives, Plaintiff Teilmann decided to

18  permanently cancel his subscription and was unable to obtain a full refund. As a direct result of

19  Defendant's violations of the ARL as alleged herein, Mr. Teilmann suffered economic injury. The

20  facts giving rise to Mr. Teilmann's claims are materially the same as those of the Class he seeks to

21  represent.

22  10.    Defendant Ultimate Guitar USA LLC. ("Ultimate Guitar" or "Defendant") is a

23  Delaware corporation with its corporate headquarters and principal place of business located in

24  San Fransico, CA. Defendant offers access to certain exclusive content, products, and/or services

25  on a contract or fee basis to customers who enroll in the automatically renewing Ultimate Guitar

26  Subscriptions.  Defendant owns and operates the Ultimate Guitar Subscriptions, which it markets

27  to consumers through its Website. Defendant is responsible for the promotion, advertisement,

28  and/or marketing of the Ultimate Guitar Subscriptions, and it owns and operates the Website.

1   Defendant sells – and, at all times during the Class Period, sold – the Ultimate Guitar

2   Subscriptions in California and has done business throughout California and the United States.

3          11.      Plaintiff reserves the right to amend this Complaint to add different or additional

4   defendants, including without limitation any officer, director, employee, supplier, or distributor of

5   Defendant who has knowingly and willfully aided, abetted, and/or conspired in the false and

6   deceptive conduct alleged herein.

7                                    **JURISDICTION AND VENUE**

8          12.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as

9   amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action

10  where the aggregate claims for all members of the proposed class are in excess of $5,000,000.00,

11  exclusive of interests and costs, there are over 100 members of the putative class, and at least one

12  class member is a citizen of a state different from Defendant.

13         13.      This Court has personal jurisdiction over the parties because Plaintiff resides in this

14  District and because Defendant has, at all times relevant hereto, systematically and continually

15  conducted, and continues to conduct, business in California, including within this District.

16  Defendant therefore has sufficient minimum contacts with this state, including within this District

17  and/or intentionally availed itself of the benefits and privileges of the California consumer market

18  through the promotion, marketing, and sale of its products and/or services to residents within this

19  District and throughout California. Additionally, Defendant is headquartered in this District and it

20  marketed and sold the Ultimate Guitar Subscription to Plaintiff in this District.

21         14.      Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because

22  a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this

23  District.  Also, Plaintiff resides in this District and purchased Defendant's Ultimate Guitar

24  Subscription in this District.  Moreover, Defendant systematically conducts business in this

25  District and throughout the State of California, and it distributed, advertised, and sold the Ultimate

26  Guitar Subscriptions to Plaintiff and Class Members in this State and District.

27

28

## FACTUAL BACKGROUND

**A.    Background On The Subscription e-Commerce Industry**

15.    The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[4]  Subscription e-commerce services now target a wide range of customers and cater to a variety of specific interests.  Given the prevalence of online and e-commerce retailers, subscription e-commerce has grown rapidly in popularity in recent years.  Indeed, the "subscription economy has grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[5]  Analysts at UBS predict that the subscription economy will expand into a $1.5 trillion market by 2025, up from $650 billion in 2020.[6]  That constitutes an average annual growth rate of 18%, which makes the subscription economy "one of the fastest-growing industries globally."[7]

16.    The production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity over the past few years.  According to *Forbes*,

---

[4] Core DNA, *How to Run an eCommerce Subscription Service: The Ultimate Guide* (May 19, 2020), https://www.coredna.com/blogs/ecommerce-subscription-services.

[5] Business Insider, *Taco Bell's taco subscription is rolling out nationwide — here's how to get it* (Jan. 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

[6] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html ("[A]t close to USD 650 billion in 2020, we expect the subscription economy to expand into a USD 1.5 trillion market by 2025, implying an average annual growth rate of 18%.").

*See also* Subscribed, *UBS Declares: It's Worth Investing in the Subscription Economy* (Apr. 17, 2021), https://www.subscribed.com/read/news-and-editorial/ubs-declares-its-worth-investing-in-the-subscription-economy; Business 2 Community, *The Subscription Economy Is Booming Right Now. But Are You Reaping the Full Benefits?* (Oct. 7, 2021), https://www.business2community.com/ecommerce/the-subscription-economy-is-booming-right-now-but-are-you-reaping-the-full-benefits-02434851.

[7] UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *supra* ("[Growth] was seen across many areas, including e-commerce, video streaming, gaming, cloud-based applications, etc."); *see also* Juniper Research, *Subscriptions For Physical Goods To Overtake Digital Subscriptions By 2025; Growing To Over $263bn Globally* (Oct. 12, 2020),

---

"[t]he subscription e-commerce market has grown by more than 100% percent a year over the past five years, with the largest retailers generating more than $2.6B in sales in 2016, up from $57.0M in 2011."[8]  Following 2016, market growth within the industry increased exponentially, reaching $650 billion in 2020.[9]  "As such, the financials of companies with subscription business models[] … improved dramatically in 2020 thanks to limited revenue volatility and strong cash flow generation."[10]  Thus, "[t]he share prices of most subscription companies have performed well in recent years."[11]

17.     The expansion of the subscription e-commerce market shows no signs of slowing. "We're now in the subscriptions era, and the pandemic is accelerating its takeover.  During the COVID-19 lockdowns, many digital-based subscription business models fared well due to their promise of convenience and strong business continuity."[12]  According to *The Washington Post*, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] … The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[13]

---

https://www.juniperresearch.com/press/subscriptions-for-physical-goods-to-overtake (acknowledging "the significant lead the digital sector has had in th[e] area[ of digital service subscriptions]").

[8] Forbes, *The State Of The Subscription Economy, 2018* (Mar. 4, 2018), https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-2018/#6ad8251a53ef.

[9] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *supra.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ (noting that "e-commerce and entertainment subscriptions to sites such as Netflix, Hulu and Disney Plus made headlines during the pandemic for soaring growth").

18.     However, as *The Washington Post* has noted, there are downsides associated with the subscription-based business model.[14]  While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[15]  In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[16]  Yet, retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[17]  As these companies have realized, "[t]he real money is in the inertia."[18]  As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[19]  That is, to facilitate consumer inertia, a number of subscription e-commerce companies, including Defendant, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans.  They do this by intentionally confusing users with the design and flow of their website and apps, *e.g.*, by making promises of

---

[14] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[15] McKinsey & Company, *Thinking inside the subscription box: New research on e-commerce consumers* (Feb. 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[16] *Id.*

[17] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[18] *Id.*

[19] Business Insider, *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want* (Jun. 25, 2019), https://www.businessinsider.com/dark-patterns-online-shopping-princeton-2019-6.

'free trials' that convert after only a matter of days, and other misleading tactics," such as failure to fully disclose the terms of its automatic renewal programs.[20]

19.     To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[21]  Moreover, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[22] For instance, numerous companies, including Defendant, have resorted to using "dark patterns" on their e-commerce platforms.  A dark pattern is "a user interface carefully crafted to trick users into doing things they might not otherwise do, such as … signing up for recurring bills."[23]  Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts[ and] attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[24] widespread utilization of misleading dark patterns and deliberate omissions persist.

20.     Ultimate Guitar successfully capitalized on this demand. Following its initial success as a user-generated content platform, Ultimate Guitar quickly evolved to offer over 1.6

---

[20] TechCrunch, *Sneaky subscriptions are plaguing the App Store* (Oct. 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.

[21] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), *supra* ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also* New Media and Marketing, *The problem with subscription marketing* (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/.

[22] *Id*.

[23] UX Design, *Dark patterns in UX: how designers should be responsible for their actions* (Apr. 15, 2018), https://uxdesign.cc/dark-patterns-in-ux-design-7009a83b233c (quoting UX designer Harry Brignull (PhD Cognitive Science), who coined the term "Dark Patters" in August 2010).

[24] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), *supra*.

million tabs and chords for more than 900,000 songs from over 115,000 artists.[25] Today, Ultimate

Guitar hosts millions of users, making it the largest community of guitar enthusiasts in the world.[26]

**B.    Defendant's Dark Patterns And Online Consumer Complaints
         About the Ultimate Guitar Subscriptions**

21.    Defendant's recent growth in revenue and subscriber count with respect to its

Ultimate Guitar Subscriptions coincides with a sharp decline in subscriber satisfaction as the

Ultimate Guitar Subscriptions and the platforms from which they operate have become riddled

with "dark patterns."  Specifically, Defendant has used various types of dark patterns, including

but not limited to "Roach Motel,"[27] "Misdirection,"[28] and "Forced Continuity," [29] in order to

prevent users from canceling their Ultimate Guitar Subscriptions by way of adopting complex

cancellation procedures to increase the friction in the subscription cancellation process.

Defendant's utilization of these dark patterns – especially in conjunction with its failure to fully

disclose the terms of its automatic-renewal programs (discussed further below) – has led to a

reduction in churn rates by making it next to impossible for subscribers to cancel their Ultimate

Guitar Subscriptions. It has further led to an increase in accidental or unintentional sign-ups by

---

[25] DBpedia, *About: Ultimate Guitar*, https://dbpedia.org/page/Ultimate_Guitar (last accessed June 25, 2025).

[26] EIN Presswire, *Music-Learning via Machine-Learning: Ultimate Guitar Launches Practice Mode* (Jan. 13, 2024), https://www.einpresswire.com/article/685220224/music-learning-via-machine-learning-ultimate-guitar-launches-practice-mode?code=MGikwsPN8ycr7cPq (last accessed June 25, 2025).

[27] "Roach Motel" refers to a "design [that] makes it very easy for [consumers] to get into a certain situation, but then makes it hard for [consumers] to get out of it (e.g. a subscription)." https://www.darkpatterns.org/types-of-dark-pattern/roach-motel.

[28] "Misdirection" is a type of dark pattern where a website's "design purposefully focuses [customers'] attention on one thing in order to distract [them] attention from another."  In many cases, "[w]hat's deceptive is the way [the website] presents [purchase] options: it uses misdirection to hide what is actually happening[.]"  https://www.darkpatterns.org/types-of-dark-pattern/misdirection.

[29] One example of "Forced Continuity," another type of dark pattern, is where customers' sign up for a "free trial with a service[ that] comes to an end and [their] credit card silently starts getting charged without any warning.  [The subscriber is] are then not given an easy way to cancel the automatic renewal."  https://www.darkpatterns.org/types-of-dark-pattern/forced-continuity.

consumers for paid Ultimate Guitar Subscriptions, in effect increasing subscriber count and, thus, Defendant's overall revenues from renewal fees.[30]

22.    Defendant's use of dark patterns is so egregious that the company's practices were used as an example in an academic paper on the proliferation of dark patterns. [31]  The study's findings of Defendant's dark patterns employed on its Website are summarized below:

| UI - Component | Dark Pattern Categories | Possible Effects on Users |
|---|---|---|
| Cookie Selection Screen | Consent Wall, Forced Action, Obfuscation | Unintentional consent for the use of user data. |
| Sale Countdown | Urgency | Rushed purchase of Pro Membership without much thought. |
| Registered Users Counter | Social Proof | Lower threshold to creating an account. |
| Fake Video Player | Disguised Ads | Unintentional redirect to Pro Purchase page. |
| Fake Tutorial Video | Disguised Ads, Misdirection | Redirect to Pro Purchase page and wanted tutorial not actually existing. |
| Pro Membership Selection | Misdirection, Default Settings, Sneaking | Selecting the wrong payment plan. |
| One Time Welcome Gift | Scarcity, Urgency | Rushed purchase of Pro Membership without much thought. |
| Occasional Pro Popup | Nagging | Annoyance. |
| Two Versions of Pro | Misdirection | Defying of user expectations. Possible purchase of 'wrong' Pro Version. |

**Table 2** – Found dark patterns in Ultimate Guitar summarized

---

[30] *See* Gizmodo, *Pervasive 'Dark Patterns' Are Fooling People Into Signing Up for Services They Don't Want* (Sep. 15, 2022), https://gizmodo.com/dark-patterns-ui-cancel-subscription-1849542166 ("As much as you think you have full control of you and your wallet, it's getting increasingly difficult for anybody using an app or a website to avoid getting suckered into surrendering your money or personal information to misleading or tricky UI design. … Tech companies and online retailers [] lure users into signing up for subscription services while obscuring costs or charges, then making it difficult to actually cancel.  Some dark patterns include confusing users in dense terms of service to obscure key limitations of products or junk fees attached to their use.")

[31] Ylikoski, *Dark Patterns in UI-Design and how to identify them* (Apr. 23, 2021), Lappeenranta - Lahti University of Technology LUT https://gizmodo.com/dark-patterns-ui-cancel-subscription-1849542166 (last accessed June 25, 2025).

23.    Although the study illustrates the dark patterns evident as of April 2021, little has been rectified since. If anything, the Ultimate Guitar Subscription signup interface has only become more cluttered and deceptive, as outlined in greater detail below.

24.    Defendant continues to employ these deceptive tactics to lure consumers into enrolling and remaining enrolled, in paid Ultimate Guitar Subscription programs. Defendant's conduct has drawn the attention and ire of customers across the country, with countless angry customers taking to the Internet to voice their discontent over Defendant's deceitful tactics.

25.    For instance, numerous subscribers have left scathing reviews on the Better Business Bureau website, complaining of confusion regarding obscured or undisclosed subscription terms, such as Defendant's unclear free trials, billing practices and the confusing cancellation policy associated with the Ultimate Guitar Subscriptions.[32]

---

[32] https://www.bbb.org/us/ca/san-francisco/profile/digital-advertising/ultimate-guitar-usa-llc-1116-528096/complaints (last accessed June 24, 2025).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

👤 **Initial Complaint**

Type: $ Billing Issues

Date: 04/10/2025

Status: ✂ Unanswered

On April 5, 2025, I was charged for service i did not agree to or request. With options available for monthly recurring subscriptions, I purchased a singly month of service for a higher rate than had I purchased recurring monthly service. the company charged me for a second month without authorization. I specifically selected a single month of service and they charged me for the same service twice.

👤 **Initial Complaint**

Type: 🔧 Service or Repair Issues

Date: 03/24/2025

Status: ✂ Unanswered

i ordered the program from these guys for $99.99 had some issues with payment going thru then was charged twice. when i got my credit card statement i saw the charges and i reached out to customer service i was told that they had turned off auto renew but it was to late to offer a refund. This feels like theft to me.

👤 **Initial Complaint**

Type: 📢 Sales and Advertising Issues

Date: 03/18/2025

Status: ✂ Unanswered

I signed up for a free trial. I have the email stating I had one subscription for the website. I canceled the subscription, but I was still charged. I tried to reach out to the company and they told me I only canceled one part of the free trial. I only selected one part of this website. I have the email showing that I only signed up for one portion of the trial. I have the email from them stating I canceled, but they refuse to refund my money and will not answer any more of my emails. I have attached the emails showing I only had one subscription and their email stating that I did cancel the subscription.

👤 **Initial Complaint**

Type: 🔧 Service or Repair Issues

Date: 03/06/2025

Status: ✂ Unanswered

I was charged for two services at $99 each. I received a cancellation email and requested multiple times for a full refund of $198 and for my data to be deleted. Both requests have been refused.

👤 **Initial Complaint**

Type: 👤 Customer Service Issues

Date: 02/20/2025

Status: ✂ Unanswered

I had a 7 day free trial for the subscription. I thought that was how I get the free trial when I filled out the information. The day I tried to cancel it on the last day of the trial, I couldn&#*;t do it. Every time I tried to cancel it, I couldn&#*;t cancel it. It is tricky. I would like to ****** the subscription.

👤 **Initial Complaint**

Type: $ Billing Issues

Date: 02/19/2025

Status: ✂ Unanswered

I cancelled this subscription 2 years ago and they continue to charge my card. Last year it was $20, I was busy and I let it go. Now it's $34.99 and I'm not going to let this go.

1

2      26.    Other subscribers to the Ultimate Guitar Subscriptions left similar complaints on

3  the Trust Pilot's website:[33]

4

5


**Stuart**
GB • 102 reviews

Dec 20, 2024

6

7
★★★★★

**They spammed me offering "90% off"**

8      They spammed me offering "90% off". Turns out that was 90% off an
       alleged £400 per year subscription! Enough said - I will not even
9      consider using an app that shows that level of transparent dishonesty.

       **Date of experience:** December 20, 2024

10

👍 Useful    ⌁ Share    ⚐

11

12


**Diego Spiniak**
CL • 1 review

Nov 27, 2024

13
★★★★★

**Beware of Fraud**

14     Ultimate guitar has tried 2 years in a row to charge me a Pro
       subscription when I never subscribed to it.

15
       **Date of experience:** November 27, 2024

16

17     👍 Useful    ⌁ Share    ⚐

18


**Sue**
GB • 14 reviews

May 25, 2024

19

20
★★★★★

**Watch out**

21     Watch out! Clicked link for 7 day free trial and half price £35 annual sub.
       They deducted £69 by PayPal and set themselves up to take it again
22     next year. When I spotted this I tried to cancel and refund. Paypal
       decided the £69 was authorised by me - it jolly well wasn't- and closed
23     the case. No refund by them. These crooks after half a dozen emails
       said "we don't refund Android subs". No refund from them. Better make
24     very good use of an app I don't like the look of. Awful company.

25     **Date of experience:** May 25, 2024

26
👍 Useful    ⌁ Share    ⚐

27

────────────────────

28 [33] https://www.trustpilot.com/review/tabs.ultimate-guitar.com (last accessed June 24, 2025).

27.     The above reviews are just a sampling of numerous negative reviews consumers have left regarding Defendant's Ultimate Guitar Subscriptions and the unclear cancellation policies and confusing billing associated with the Subscriptions.  As discussed below, the above online consumer complaints reveal a widespread pattern of uniform unlawful conduct by Defendant, underscoring the artifice devised and employed by Defendant to lure and deceive millions of consumers into enrolling, and remaining enrolled, in their paid Ultimate Guitar Subscription programs.

### C.      California's Automatic Renewal Law

28.     In 2010, the California Legislature enacted the Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq*., with the intent to "end the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."  Cal. Bus. & Prof. Code § 17600 (statement of legislative intent).  More recently, in 2018, California's Senate Bill 313 amended Section 17602 of the ARL, adding new requirements meant to increase consumer protections for, among other things, orders that contain free trial and promotional pricing, and subscription agreements entered into online.  The California Legislature again amended the ARL in 2022, adding additional notice, disclosure, and cancellation requirements.  *See* Cal. Bus. & Prof. Code §§ 17602(a)(4)(A)-(E), 17602(b)(1)-(2), 17602(d)(1)-(3).

29.     The ARL makes it "unlawful for any business making an automatic renewal or continuous service offer to a consumer in this state to do any of the following:"

> (1)  Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer.  If the offer also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial.

> (2)  Charge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous

service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time.

(3)  Fail to provide an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer.  If the automatic renewal offer or continuous service offer includes a free gift or trial, the business shall also disclose in the acknowledgment how to cancel, and allow the consumer to cancel, the automatic renewal or continuous service before the consumer pays for the goods or services.

Cal. Bus. & Prof. Code § 17602(a)(1)-(3).

30.     As of 2018, the updated ARL also requires that, prior to the completion of the initial order for the automatic renewal or continuous service, sellers must explain the price to be charged when the promotion or free trial ends.  *See* Cal. Bus. & Prof. Code § 17602(a)(1), *supra*.  If the initial offer is at a promotional price that is only for a limited time and will increase later, the seller must obtain consumer consent to the non-discounted price prior to billing.  *See id*.  Sellers must also notify consumers in the acknowledgment about how to cancel the free trial before they are charged.  *See* Cal. Bus. & Prof. Code § 17602(a)(3), *supra*.

31.     Section 17602(c) of the ARL further provides:

A business that makes an automatic renewal offer or continuous service offer **shall provide a toll-free telephone number, electronic mail address**, a postal address if the seller directly bills the consumer, **or it shall provide another cost-effective, timely, and easy-to-use mechanism for cancellation** that shall be described in the acknowledgment specified in paragraph (3) of subdivision (a).

Cal. Bus. & Prof. Code § 17602(c). (emphasis added).

32.     Additionally, following the 2018 and 2022 amendments to the ARL, the updated law also requires e-commerce sellers, doing business in California, to allow online cancellation of auto-renewing memberships or recurring purchases that were initiated online.  Specifically, Section 17602(d) provides:

> [A] business that allows a consumer to accept an automatic renewal or continuous service offer online shall allow a consumer to terminate the automatic renewal or continuous service ***exclusively online, at will, and without engaging any further steps that obstruct or delay the consumer's ability to terminate the automatic renewal or continuous service immediately***.

Cal. Bus. & Prof. Code § 17602(d)(1) (emphasis added).

33.     The updated ARL further specifies that a seller who provides an automatic offer "shall provide a method of termination that is online in the form of either of the following: (A) A prominently located direct link or button which may be located within either a customer account or profile, or within either device or user settings[; or] (B) By an immediately accessible termination email formatted and provided by the business that a consumer can send to the business without additional information." Cal. Bus. & Prof. Code § 17602(d)(1)(A)-(B).

34.     Section 17601(a) of the ARL defines the term "Automatic renewal" as a "plan or arrangement in which a paid subscription or purchasing agreement is automatically renewed at the end of a definite term for a subsequent term."  Cal. Bus. & Prof. Code § 17601(a).

35.     Section 17601(b) of the ARL defines the term "Automatic renewal offer terms" as "the following clear and conspicuous disclosures: (1) That the subscription or purchasing agreement will continue until the consumer cancels.  (2) The description of the cancellation policy that applies to the offer.  (3) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known.  (4) The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer.  (5) The minimum purchase obligation, if any."  Cal. Bus. & Prof. Code § 17601(b).

36.     Pursuant to Section 17601(c) of the ARL, "clear and conspicuous" or "clearly and conspicuously" means "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbol ls or other marks, in a manner that clearly calls attention to the language."  Cal. Bus. & Prof. Code § 17601(c).

37. Finally, Section 17603 of the ARL provides that where a "business sends any goods, wares, merchandise, or products to a consumer, under a continuous service agreement or automatic renewal of a purchase, without first obtaining the consumer's affirmative consent[,]" the material sent will be deemed "an unconditional gift to the consumer, who may use or dispose of the same in any manner he or she sees fit without any obligation whatsoever on the consumer's part to the business[.]" Cal. Bus. & Prof. Code § 17603.

38. As alleged below, Defendant's practices on the Website systematically violate Sections 17602(a)(l), 17602(a)(2), 17602(a)(3), 17602(c), and 17602(d) of the ARL.

**D. Defendant's Business: The Ultimate Guitar Subscription Enrollment Process**

39. At all relevant times, Defendant offered, via the Website, the Ultimate Guitar Subscriptions for access to exclusive Ultimate Guitar content, products, and/or services on a contract or fee basis. The Ultimate Guitar Subscriptions are offered on a recurring basis for a monthly or yearly term, after free trial, and all plans automatically renew at the end of the defined renewal term unless the subscriber cancels. The enrollment process for all of the Ultimate Guitar Subscriptions is substantially the same.

40. By way of example, when a consumer signs up for the Ultimate Guitar Pro Subscription, their Ultimate Guitar Subscription is automatically renewed and the consumers' Payment Methods are charged the full standard recurring amount associated with that Ultimate Guitar Subscription, currently "$24.99" (exclusive of tax), for the next month, and every month thereafter if they do not cancel. Likewise, when customers sign up for the "Free Trial" Ultimate Guitar Pro Subscription, after their initial 7-day trial expires, their subscriptions are automatically renewed, and their Payment Methods are charged the full yearly recurring amount, currently "$99.99" (exclusive of tax), for the next year, and every year thereafter if they do not cancel. Defendant's Ultimate Guitar Subscriptions constitute automatic renewal and/or continuous service plans or arrangements for the purposes of Cal. Bus. & Prof. Code § 17601.

41. Consumers can sign up for Defendant's Ultimate Guitar Subscription plans through the Website. Defendant automatically enrolls customers who purchase an Ultimate Guitar

Subscription via the Website in their chosen Ultimate Guitar Subscription program going forward, by default. In addition, customers may sign up for several of the Ultimate Guitar Subscriptions on a promotional basis (*i.e.*, at a discounted renewal rate), for a limited time. Nevertheless, customers who enroll in a discounted rate plan must provide Defendant with their payment information at the time of enrollment, and their Payment Methods are automatically charged by Defendant on a recurring yearly or monthly basis in the discounted amount associated with that offer, continuing indefinitely until the customer takes affirmative steps to cancel.

42. The enrollment processes for all of the Ultimate Guitar Subscriptions is substantially the same. Upon navigating to Defendant's Website, prospective customers are greeted with a centered and contrasting "TRY FOR FREE" button on the Website. Screenshots of Defendant's Website are added below by way of illustration, (boxes and arrows added for emphasis):



43. Pressing the "TRY FOR FREE" button opens a lightbox with confusing payment plans:



44.     The lightbox is titled "**Start Free 7-Day Trial**" along with "**Charge Today: $0.00**" Beneath those statements, in a much smaller font, the lightbox states "$99.99 billed annually after free trial ends" which is confusing because at no point was the "Try for Free" or "Free Trial" offer presented as a recurring subscription at all. This is done by design, as evidenced by the fact that the monthly offer is not even presented, as well as the distinct prominence of the larger and bolded font of the conspicuous $0.00 price. As such, Defendant purposely steers consumers into a yearly Ultimate Guitar Subscription.

45.     After clicking "Continue," consumers are directed to the final lightbox of the enrollment process (the "Checkout Page") where prospective subscribers are prompted to input their payment information and are then invited to complete their purchase by selecting the green button at the bottom of the webpage.  For the purposes of the ARL and this Complaint, the "relevant portion of the Checkout Page" refers to the text of that portion of the Checkout Page that appears "in visual proximity to the request for consent to the offer," which in this case pertains to text nearby the final green button at the bottom of the Checkout Page that customers must click in order to complete the checkout process.

46.    By way of example, when a consumer signs up for a yearly Ultimate Guitar Pro Subscription on a free trial basis, the "relevant portion of the Checkout Page" refers to the disclosures contained in the block of gray text underneath the green "START 7-DAY TRIAL NOW" checkout button at the bottom of the page (*i.e.*, the "request for consent"), which contains the following language and appearance, after scrolling all the way down (red box added for emphasis):





47.     The layout and text of the Checkout Page for each of the paid Ultimate Guitar Subscriptions is aesthetically and functionally similar to the Checkout Page for the above-illustrated Ultimate Guitar Subscription.  In all cases, the relevant portion of the Checkout Page fails to adequately disclose the automatic renewal terms associated with Defendant's Ultimate Guitar Subscriptions in the manner required by law.

48.     Regardless of how the consumer subscribes (via the Website, on either its desktop or mobile format), and irrespective of which Ultimate Guitar Subscription program or which specific plan the subscriber selects (whether monthly, yearly, or on a promotional basis), Defendant fails to disclose the full terms of its auto-renewal programs either before or after checkout, and it never requires the individual consumer to read or affirmatively agree to any terms of service, *i.e.*, by requiring consumers to click a checkbox next to the automatic renewal offer terms before consumers complete the checkout process and submit their orders for their Ultimate Guitar Subscriptions. Consequently, Defendant uniformly fails to obtain any form of consent from – or even provide effective notice to – their subscribers before charging consumers' Payment Methods on a recurring basis.

**E.     Defendant Violates California's Automatic Renewal Law**

49.     At all relevant times, Defendant failed to comply with the ARL in three ways: (i) Defendant failed to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement was fulfilled, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (ii) Defendant charged Plaintiff's and Class members' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (iii) Defendant failed to provide an acknowledgment that included the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3).  Defendant also fails to provide an acknowledgment that discloses a toll-free telephone number or describes another cost-effective, timely, and easy-to-use mechanism for cancellation, and, in fact, Defendant makes it exceedingly difficult and unnecessarily confusing for

consumers to cancel their Ultimate Guitar Subscriptions, in violation of Cal. Bus. & Prof. Code §§ 17602(c) and 17602(d).

### i. Defendant Fails To Clearly And Conspicuously Present The Ultimate Guitar Subscription Terms Before The Subscription Agreement Is Fulfilled And In Visual Proximity To The Request For Consent To The Offer.

50.    As an initial threshold, the relevant portion of the Checkout Page containing the purported automatic renewal offer terms is not "clear and conspicuous" as required under the statute. *See* Cal. Bus. & Prof. Code § 17601(c).  As illustrated by the Checkout Pages above, this information is presented in minuscule, grey font (7.5 point to be exact) without emphasis or distinction—making it eligible to the naked eye. Furthermore, the block of text is provided in a *smaller* size text as compared to most other text of the Checkout Page.  Indeed, much of the other text of the Checkout Page is significantly larger and, in effect, more visually prominent than any disclosures contained in this block of text beneath the "START 7-DAY TRIAL NOW" button, which renders this tiny text in the relevant portion of the Checkout Page considerably less conspicuous by comparison and ultimately distracts the eye away from such small text and towards the larger text featured on the majority of the Checkout Page.  In other words, the disclosure was presented in such a way that it could be, and was, easily overlooked, and is therefore not "clear and conspicuous" as defined by the ARL. *See* Cal. Bus. & Prof. Code § 17601(c).[34]

---

[34] Based on these features, this block of text placed near the bottom of the Checkout Page and all statements and disclosures buried therein constitute "fine print."  *See Fine Print*, Black's Law Dictionary (9th ed. 2009) (defining "fine print" as "[t]he part of an agreement or document—usu. in small, light print that is not easily noticeable—referring to disclaimers, restrictions, or limitations."); *see also Fine Print*, The Law Dictionary, *available at* https://thelawdictionary.org/fine-print/ (defining "Fine Print" as "[a] small type size that contracts and policy are sometimes printed in" and noting that "[t]he print is small as it relates to rules, deductions, exlusions, and reductions of a policy" and that "[i]t is smaller print than the main part of the document").  **That it is exactly the type of deceptive practice that the California Legislature sought to deter and penalize when it enacted the ARL.**  *See Turnier v. Bed Bath & Beyond Inc.*, 517 F. Supp. 3d 1132, 1140 n.6 (S.D. Cal. 2021) (ARL Case) ("Notably, the practice that led to ARL was the inclusion of autorenewal terms in fine print."); *see also Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022) ("Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print.  Because 'online providers have

51.     Furthermore, the Checkout Page for the Ultimate Guitar Subscriptions does not present the complete "automatic renewal offer terms[,]" as defined by Cal. Bus. & Prof. Code § 17601(b), in violation of Section 17602(a)(1) of the ARL.  First, the Checkout Page does not clearly and conspicuously disclose that "the subscription or purchasing agreement will continue until the consumer cancels."  Cal. Bus. & Prof. Code § 17601(b)(1).  As illustrated by the Checkout Page above, although the relevant portion mentions that Ultimate Guitar will "charge the annually membership fee (currently $99.99) to your payment method at the start of each billing period unless you cancel," *see supra* ¶ 46, it is unclear when, exactly, consumers must cancel by and how that cancellation affects the continuation of their Ultimate Guitar Subscriptions. Specifically, the relevant portion of the Checkout Page states that consumers may are "[f]ree to cancel anytime," this information is contradicted by the sentence in the relevant portion which states that their "subscription will start now" and that if they "want to cancel, click here." *Id.* Based on this information, it is unclear whether consumers may actually "cancel anytime" or whether they must do so immediately. Furthermore, because the relevant portion of the Checkout Page does not indicate when consumers' "trial ends," as discussed in greater detail *infra*, the most sensible interpretation of the text suggests that the paid subscription may be canceled "anytime" while the "trial" must be canceled "before any applicable promotional period." *Id.* This problem is compounded, rather than cured, by the other information displayed on the Checkout Page which indicates that there are "[n]o commitments" and that consumers "won't be charged during [their] trial period." *Id.* This information, again, leaves consumers wondering when their free trial ends, given that the relevant portion of the Checkout Page states that their "subscription will start now" and that that "Ultimate Guitar will automatically continue [their] membership and charge the annual membership fee…unless [they] cancel" and that they must "click here" if they wish to cancel. *Id.* As a result of this conflicting information, consumers are left wondering when, exactly,

complete control over the design of their websites,' 'the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers.") (internal citations omitted). As a result, any disclosures contained within the relevant portion of Defendant's Checkout Pages – which bury incomplete, unclear, and inconspicuous disclosures regarding required terms in fine print – fail to comply with the ARL.

1   they must cancel their "trial" or, alternatively, whether any deadlines apply to the cancelation of

2   their paid subscription, which would contradict the "[n]o commitments" and "cancel anytime"

3   verbiage. In sum, because Defendant's confusing Checkout Page makes it unclear (a) when

4   consumers must cancel their Ultimate Guitar Subscriptions or free trials to prevent the free trial of

5   the Ultimate Guitar Subscriptions from continuing into a paid subscription and (b) whether

6   canceling the paid Ultimate Guitar Subscriptions immediately terminates the subscription or if it

7   continues to run until the next billing cycle. As such, Defendant fails to disclose "[t]hat the

8   subscription or purchasing agreement will continue until the consumer cancels," *id*. § 17601(b)(1),

9   in the manner required by statute, *see id*. § 17602(a)(1).

10       52.     Second, the Checkout Page does not clearly and conspicuously disclose "[t]he

11   description of the cancellation policy that applies to the offer."  Cal. Bus. & Prof. Code §

12   17601(b)(2).  Specifically, although the relevant portion of the Checkout Page indicates that

13   "Ultimate Guitar will automatically continue your membership and charge the annual membership

14   fee (currently $99.99)…at the start of each billing period unless you cancel," this information is

15   directly contradicted by the more prominent "[n]o commitments" and "cancel anytime" text

16   provided elsewhere on the Checkout Page. *See supra* ¶ 51. Furthermore, Defendant fails to specify

17   the consequences of canceling the subscriptions. For instance, the relevant portion of the Checkout

18   Page of the indicates that consumers must "cancel" before the "start of each billing period" or

19   "before any applicable promotional period to avoid charges" *see id.*, Defendant, however, does not

20   specify what it means "to avoid charges." Instead, a consumer would need to click on the blue

21   "Terms of Use," which are disjointed by six lines of text, where Defendant explains that if

22   consumers "*during the first fourteen (14) days* of your subscription term you will receive a refund

23   of the difference between the then-in-effect and current subscription fee to which You are

24   subscribed and the then-in-effect and current monthly subscription fee."[35] In other words,

25   Defendant defines "charges" as synonymous with liquidated damages in the amount of the

26   difference between cost of a monthly charge and a yearly charge—*i.e.*, $99.99 – $24.99, meaning

---

27   [35]Ultimate Guitar, *Terms Of Service*, (emphasis on original), https://www.ultimate-

28   guitar.com/about/tos.htm?app_utm_source=landing_checkout, (last accessed June 25, 2025).

that consumers' would still be charged $75.00 equaling 75% of their yearly subscription. To make matters even worse, by effectuating this cancellation, consumers lose access to their yearly subscription, which instead automatically converts to "a free account at the end of the 30-day period."[36] This constitutes a clear and material omission of fact. In fact, the relevant portion of the Checkout Page is completely silent about this provision. If consumers were aware of these onerous "charges," they would likely not have purchased the Ultimate Guitar Subscription or would have canceled it before the deadline. In sum, because Defendant fails to conspicuously disclose the deadlines and consequences associated with canceling the Ultimate Guitar Subscriptions, and associated free trials, it also fails to conspicuously describe "[t]hat the subscription or purchasing agreement will continue until the consumer cancels," *id*. § 17601(b)(2), in the manner required by statute, *see id*. § 17602(a)(1).

53.    Third, the Checkout Page does not clearly and conspicuously disclose "[t]he recurring charges that will be charged to the consumer's Payment Method as part of the automatic renewal plan or arrangement." Cal. Bus. & Prof. Code § 17601(b)(3). Specifically, although the relevant portion of the Checkout Page indicates that consumers will be charged "the annually membership fee (currently $99.99) to your payment method at the start of each billing period," *see supra* ¶ 51, it leaves them guessing as to the total amount amounts of their recurring charges until Defendant charges their Payment Method inclusive of taxes—something Defendant could have easily disclosed beforehand. To make matters worse, Defendant does not specify the exact amount of the "membership fee," which seems to fluctuate, given that it is disclosed within parentheses as "currently $99.99." *Id.* As such, consumers are not informed of what their "membership fee" will "currently" be once their Ultimate Guitar Subscriptions are renewed.

54.    Furthermore, the relevant portion of the Checkout Page is rendered even more inconspicuous by the much larger price figures provided at the top of the Checkout Page which state in bolded text that they will be charged "$0.00" for their "Unlimited 7-Day access to the UG PRO" and "Free 2+ million tabs." *See supra* ¶ 46. The $0.00 representations are in direct tension with the

---

[36] *Id.*

*fluctuating* "$99.99" fee (not inclusive of taxes). Thus, even had this required automatic renewal offer term been conspicuously disclosed in the Checkout Page (it was not), the disclosure as written provides contradictory information, and, based on that statement, a subscriber is not placed on notice of the applicable and precise recurring amount that will be automatically withdrawn from his or her Payment Method each renewal period in connection with the Ultimate Guitar Subscriptions. Thus, Defendant fails to provide notice of "[t]he recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement," *id*. § 17601(b)(3), in the manner required by statute, *see id*. § 17602(a)(1).

55.    Fourth, the Checkout Page does not clearly and conspicuously disclose "[t]he length of the automatic renewal term or that the service is continuous." Cal. Bus. & Prof. Code § 17601(b)(4). For instance, although the relevant portion of the Checkout Page indicates that consumers are "[s]taring [a] 7-day trial," immediately thereafter, the disclosure states that their "subscription will start now" and " will automatically continue" subject to the "annually membership fee (currently $99.99) [which will be charged to their] payment method at the start of each billing period until [they] cancel." *See supra* ¶ 46. Based on the disclosure's plain meaning, the "billing period" statement makes the length of the subscription unintelligible. On a literal level, because that "billing period" is untethered to any specific date, it could only be read to modify the "7-day trial" subscription which "will start now." *Id*. Thus, it appears that the "annually membership fee" and "billing period" begin "now" with the initial charge postponed for 7 days for the first "billing cycle" based on the initial "trial." Alternatively, the statement "your subscription will start now" reads like a scribbler error with the "billing period" set to begin after the "7-day trial" – leaving consumers to do the arithmetic calculation in their head. This confusion is compounded by the statement that consumers must "[c]ancel before any applicable promotion period ends to avoid charges" – again, leaving consumers guessing whether the "promotional period" is synonymous with their "7-day trial." *Id*. In other words, Defendant's conflicting information fails to state what the "billing period" begins: either (1) on the date they begin their free trial or (2) at the end of their 7-day trial. *Id*. Nor does the buried Terms of Use hyperlink help clarify this ambiguity; instead, it makes it worse by modifying the words "annually" to mean "a

360-day cycle"[37]—instead of the 365 days contained in a year or 366 days for a leap year. The terms further state that the subscriptions must be cancelled "within 24 hours" before the renewal date to be effective—a requirement which is entirely missing in the relevant Checkout Page. *Id.* conflicting information by merely states that a consumer's "subscription begins as soon as [their] initial payment is processed and that "[f]or automatic renewing customers in the United States, after the first year, [their] subscription will automatically renew on a monthly basis until [they] cancel."[38] Similarly, for all of the Paid Subscriptions, Defendant fails to clarify when their respective "trial ends." The relevant portion of the Checkout Page states that consumers must cancel "before any applicable promotion period ends," which, again, makes it unclear whether their "trial" constitutes a "promotion period." Instead, the adjacent text states their subscriptions "will start now" as discussed supra. Indeed, the text buried with the Terms of Use makes matters worse by stating that "[b]y signing up to a Trial Period, [consumers] understand and agree that:…Ultimate Guitar will obtain a pre-authorization for the fee amount that you will be charged at the Expiration of the Trial Period."[39] Based on the totality of these statements, it would seem that the "7-day free trial" is actually a paid subscription with the billing period deferred for 7 days for the first year. Because the "7-day free trial" actually is a masqueraded deferred subscription carrying financial implications—including "pre-authorization for the fee amount" which "financial institutions may perceive…as actual pending charges—the "trial" is a misnomer with no start or end day once the omitted text within the Terms of Use are read. Because it is unclear when the Ultimate Guitar Subscriptions commence or end, Defendant fails to disclose "[t]hat the subscription or purchasing agreement will continue until the consumer cancels," *id*. § 17601(b)(4), in the manner required by statute. *see id*. § 17602(a)(1).

56.    In sum, neither of the statements discussed above concerning cancellation constitutes a fulsome or clear description of Defendant's cancellation policy.  Indeed, other

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

webpages of the Website beyond the Checkout Page – none of which are shown to subscribers during the enrollment process – are much clearer about the cancellation deadline, process, and the consequences of cancellation (or failing to cancel the Ultimate Guitar Subscriptions in advance of the cut-off deadline). These undisclosed terms concerning how and when to cancel, the consequences of doing so, and the availability of a refund for consumers that cancel within a specified period after enrollment constitute material aspects of Defendant's cancellation policy. At no point during the life of his Ultimate Guitar Subscription was Plaintiff required or even prompted to navigate to or otherwise examine any of the terms disclosed on any other page of the Website, aside from the Checkout Page. Thus, Plaintiff was not aware of the omitted and inadequately disclosed automatic renewal terms discussed above. Yet, prior to checkout, Defendant was obligated by law to place consumers on notice of these aspects of Defendant's cancellation policy in accordance with the ARL, which requires that companies provide such information "in visual proximity to the request for consent to the [automatic renewal] offer." Cal. Bus. & Prof. Code § 17602(a)(1); *see also id*. § 17601(b)(2). It is not enough that the cancellation policy may be set forth on the hyperlinked pages located elsewhere on the Website; the ARL requires that Defendant present its full cancellation policy directly on the Checkout Page – and it must further do so "clearly and conspicuously," *id*. § 17601(c), and with the requisite proximity (*i.e.*, they must appear in the block of text immediately above the final blue checkout button on the bottom of that page), *see id*. § 17602(a)(1) – so as to allow the consumer to read and review the applicable offer terms immediately prior to purchase.[40] However, Defendant failed, and continues to fail, to satisfy that requirement, in violation of Section 17602(a)(1) of the ARL.

---

[40] Indeed, reference to hyperlinks leading to required disclosures set forth on other pages of the Website is not tantamount to disclosure of them on the Checkout Page, as the ARL requires. *See Turnier v. Bed Bath & Beyond Inc.*, 517 F. Supp. 3d 1132, 1139-40 (S.D. Cal. 2021) (ARL Case) ("Defendant … argues the required terms were accessible through a hyperlink that was a few centimeters from the request for consent. **But the terms themselves—not the access point to them—need to be in visual proximity to the request**.") (emphasis added). Since businesses' "inclusion of autorenewal terms in fine print" was "the practice that led to ARL" in the first place, and "[t]he use of a hyperlink to the terms presents a similar practice," *id*. at 1140 n.6 (citation omitted), any required disclosures that may be contained in the hyperlinked webpages—*but not provided directly on the Checkout Page itself*—cannot satisfy the ARL. *See also id*. at 1139-40

---

57.      As a result of Defendant's missing and otherwise deficient pre-purchase

disclosures, when Plaintiff selected and enrolled in his Ultimate Guitar Subscription, he was

unaware that Defendant enrolled him in an annual "automatic renewal" program under which his

Ultimate Guitar Subscription resulted in continuous monthly automatic renewal charges to his

Payment Method, unless and until he effectively canceled the subscription.

ii.      <u>**Defendant Fails To Obtain Consumers' Affirmative
Consent To The Automatic Renewal Terms Associated
With The Ultimate Guitar Subscriptions.**</u>

58.      Second, at no point during the checkout process does Defendant require consumers

to read or affirmatively agree to any terms of service associated with their Ultimate Guitar

Subscriptions, *i.e.*, by requiring consumers to select or click a "checkbox" next to the automatic

renewal offer terms to complete the checkout process. Indeed, Defendant makes consumers

"agree" that Defendant "can obtain a pre-authorization for the fee amount" that they will be

charged at the end of their "trial" or "promotional" period, although this information is entirely

absent in the Checkout Page.[41]  Accordingly, when Defendant automatically renews customers'

Ultimate Guitar Subscriptions, Defendant charges consumers' Payment Methods without first

obtaining their affirmative consent to the agreement containing the automatic renewal offer terms,

in violation of Cal. Bus. & Prof. Code § 17602(a)(2).

---

("The required terms do not appear on the webpage that contains the request for consent.
Defendant argues it is common to use a hyperlink to terms and conditions, and that practice is
sufficient to form a valid contract.  That might be true.  <u>However, it does not change what is
required under ARL (the disclosure of terms in a specific manner and location)</u>.  **Given the terms
appear nowhere near the request for consent, Plaintiff has plausibly alleged Defendant did
not comply with section 17602(a)(1)**.") (emphasis added and internal citations omitted).

[41] Ultimate Guitar, *Terms Of Service*, (emphasis on original), https://www.ultimate-
guitar.com/about/tos.htm?app_utm_source=landing_checkout, (last accessed June 25, 2025).

---

    **iii.**  **Defendant Fails To Provide A Post-Checkout**
          **Acknowledgment That Clearly And Conspicuously**
          **Discloses The Required Ultimate Guitar Subscription**
          **Offer Terms.**

  59.  Finally, after Plaintiff and the members of the Class subscribed to one of Defendant's Ultimate Guitar Subscriptions, Defendant sent to Plaintiff and the Class email follow-ups regarding their purchases (the "Acknowledgment Email").

  60.  By way of example, at least as of May 2024, consumers who enrolled in the *free trial* for the Ultimate Guitar Subscription received an email from Defendant upon completion of the checkout process. The subject line of the Acknowledgment Email that Defendant sent to Ultimate Guitar Pro subscribers stated: "Thank you for choosing Ultimate Guitar." The body of the Acknowledgment Email contained, in relevant part, the following text and images:

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22



23      61.    The layout and text of the Acknowledgment Emails for each of the other Ultimate

24  Guitar Subscriptions during the applicable Class Period are aesthetically and functionally similar

25  to the Acknowledgment Email for the free trial and straight-to-paid Ultimate Guitar Subscriptions

26  shown above.  Moreover, although the above-shown Acknowledgment Emails are exemplars from

27  approximately May 2024, the Acknowledgment Emails that Defendant has sent to new subscribers

28  of the Ultimate Guitar Subscriptions during the Class Period (including on May 2024, when Mr.

Teilmann enrolled in his Ultimate Guitar Subscription, to and through the present day) are substantively and materially identical or substantially the same in terms of layout, organization, and most importantly, text, as the May 2024 versions shown above. In all cases, the Acknowledgment Emails for the Ultimate Guitar Subscriptions fail to adequately disclose the applicable automatic renewal terms in the manner required by law.

62. The Acknowledgment Emails suffer from substantially the same deficiencies as those on the Checkout Pages for the Ultimate Guitar Subscriptions, described above. Namely, the Acknowledgment Emails do not adequately disclose: that the subscription "will continue until the consumer cancels[,]" Cal. Bus. & Prof. Code § 17601(b)(1); a statement of "[t]he recurring charges that will be charged to the consumer's [Payment Method] as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, [and] if that is the case, and the amount to which the charge will change, Cal. Bus. & Prof. Code § 17601(b)(3); or "[t]he length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer[,]" Cal. Bus. & Prof. Code § 17601(b)(4). As in the Checkout Page, disclosures of these required automatic renewal terms are either missing altogether, are deceptively incomplete, objectively inaccurate, and/or are inconspicuously buried in the tiny fine print at the bottom of the email. As a result, the Acknowledgment Email further violates the ARL under Cal. Bus. & Prof. Code §§ 17602(a)(3) and 17602(b).

63. Additionally, the Acknowledgment Emails fail to provide a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation, and, in fact, Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Ultimate Guitar Subscriptions, which further violates the ARL under Cal. Bus. & Prof. Code § 17602(c).

\* \* \*

64. In sum, Defendant's deficient pre- and post-purchase disclosures and lack of affirmative consent fail to comply with the ARL. By and through these actions, Defendant has charged Plaintiff's and Class members' Payment Methods in direct violation of the ARL. As a result, all goods, wares, merchandise, and/or products sent to Plaintiff and the Class upon the

1   automatic renewal of their continuous service agreements are deemed to be "unconditional gifts"

2   pursuant to Cal. Bus. & Prof. Code § 17603.

3       65.     Because Defendant failed to disclose this material information in the manner

4   required by statute, Plaintiff was unable at the point of sale to accept or provide affirmative

5   consent to Defendant's offer or knowingly enter into the purchase agreements.  Thus, as a direct

6   result of Defendant's missing, incomplete, and otherwise deficient disclosures on the Checkout

7   Page and in the Acknowledgment Email, Plaintiff was induced to sign up for, unable to terminate,

8   and automatically charged for his Ultimate Guitar Subscription.

9       66.     Further, as a direct result of Defendant's unlawful conduct described above,

10  Plaintiff and putative Class Members have incurred substantial financial injury in the form of all

11  monies withdrawn from their Payment Methods in connection with the Ultimate Guitar

12  Subscriptions.  Specifically, Defendant's ARL violations concerning the Ultimate Guitar

13  Subscriptions caused Plaintiff's and Class members' financial injury because they reasonably

14  relied on the conspicuous disclosures of Defendant's Checkout Page and Acknowledgment Email

15  (and, as a natural corollary, the omissions and/or the inconspicuousness of the disclosures

16  contained therein) in deciding whether to purchase their Ultimate Guitar Subscriptions in the first

17  place and whether to continue paying for it upon after that (*i.e.*, by not cancelling the auto-

18  renewal).

19      67.     Accordingly, Plaintiff brings this action individually and on behalf of similarly

20  situated individuals against Defendant for violations of California's consumer protections statutes,

21  including California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200.  As

22  set forth in detail below, Plaintiff's claims, which are based on Defendant's failure to comply with

23  the ARL, arise under the "unlawful" prong of the UCL.  Further, because the Ultimate Guitar

24  Subscriptions were, by operation of law, "unconditional gifts" to Plaintiff and putative Class

25  Members (*see* Cal. Bus. & Prof. Code § 17603) – and thus, Plaintiff and Class Members already

26  owned the goods, tools, and benefits of the subscriptions as their personal property at the time

27  Defendant withdrew monies from their Payment Methods as consideration for access to the same,

28  without any legal or contractual authority to do so – Plaintiff's claims are also based on

Defendant's practice of charging consumers in exchange for unconditional gifts and arise under the "fraudulent" and "unfair" prongs of the UCL. Additionally, Plaintiff brings this action against Defendant for violations of the CLRA and FAL, and conversion, unjust enrichment, negligent misrepresentation, and fraud.

## CLASS ACTION ALLEGATIONS

68. **_Class Definition_**. Plaintiff brings this action on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All persons in the United States who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, incurred renewal fee(s) in connection with Defendant's offerings for paid Ultimate Guitar Subscriptions.

69. Specifically excluded from the Class are Defendant and any entities in which Defendant have a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

70. Plaintiff also seeks to represent a subclass, defined as follows (the "California Subclass"):

> All persons in California who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, incurred renewal fee(s) in connection with Defendant's offerings for paid Ultimate Guitar Subscriptions.

71. Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

72. **_Numerosity._** Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, the Class comprises at least millions of consumers. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

73. **_Commonality and Predominance_**. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether Defendant's

Ultimate Guitar Subscriptions constitute "Automatic renewal[s]" within the meaning of Cal. Bus. & Prof. Code § 17601(a); (b) whether Defendant failed to present the automatic renewal offer terms, or continuous service offer terms, in a clear and conspicuous manner before the subscription or purchasing agreement was fulfilled and in visual proximity to the request for consent to the offer, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (c) whether Defendant charged Plaintiff's and Class members' Payment Method for an automatic renewal or continuous service without first obtaining their affirmative consent to the automatic renewal offer terms or continuous service offer terms in violation of Cal. Bus. & Prof. Code § 17602(a)(2); (d) whether Defendant failed to provide an acknowledgment that included the automatic renewal or continuous service offer terms, cancellation policy, and information on how to cancel in a manner that is capable of being retained by Plaintiff and the Class, in violation of Cal. Bus. & Prof. Code § 17602(a)(3); (e) whether the goods and services provided by Defendant are deemed an "unconditional gift" in accordance with Cal. Bus. & Prof. Code § 17603; (f) whether Defendant's conduct alleged herein violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*., California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*., and/or California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (g) whether Defendant's conduct alleged herein constitutes conversion and/or unjust enrichment; (h) whether Plaintiff and the Class are entitled to damages and/or restitution; (i) whether Defendant should be enjoined from further engaging in the misconduct alleged herein; and (j) whether Plaintiff and the Class are entitled to attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

74.     ***Typicality.***  The claims of Plaintiff Teilmann are typical of the claims of the Class in that Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to obtain Plaintiff's and the Class's affirmative consent to the automatic renewal offer terms or continuous service offer terms associated with the Ultimate Guitar Subscriptions before charging their Payment Methods.

75.     ***Adequacy***.  Plaintiff will fairly and adequately protect Class members' interests. Plaintiff has no interests antagonistic to Class members' interests, and Plaintiff has retained

counsel that have considerable experience and success in prosecuting complex class-actions and consumer-protection cases.

76. *Superiority*. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

77. Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

78. Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and members of the Class and will likely retain the benefits of its wrongdoing.

79. Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

**COUNT I**
**Violations of California's Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

80. Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

81. Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

82. The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]" Cal. Bus. & Prof. Code § 17200. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Cal. Bus. & Prof. Code § 17204. Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

83.     As alleged below, Defendant has committed unlawful and/or unfair business practices under the UCL by: (a) representing that Defendant's goods and services have certain characteristics that they do not, in violation of Cal. Civil Code § 1770(a)(5); (b) advertising goods and services with the intent not to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9); and (c) converting to Defendant's own use and benefit money that rightfully belongs to Plaintiff and the Class.

84.     Additionally, at all relevant times, Defendant has violated, and continues to violate, the UCL's proscription against engaging in unlawful and/or unfair conduct as a result of its violations of the ARL, Cal. Bus. & Prof. Code §§ 17600, *et seq.*  Specifically, Defendant failed, and continues to fail, to: (a) provide the auto-renewal terms associated with its Ultimate Guitar Subscriptions "in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer," in violation of Cal. Bus. & Prof. Code § 17602(a)(1); (b) obtain the affirmative consent of Plaintiff and the Class to those terms before charging their Payment Methods, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (c) provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3).  Defendant also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Ultimate Guitar Subscriptions, in violation of Cal. Bus. & Prof. Code § 17602(b).

85.     Each of these acts and practices constitutes an independent violation of the ARL, and thus an independent violation of the UCL.

86.     All products received from Defendant in violation of the ARL, Cal. Bus. Prof. Code §§ 17602, *et seq.*, constitute "unconditional gifts."  *See* Cal. Bus. Prof. Code § 17603.  As a direct and proximate result of Defendant's unlawful and/or unfair practices described herein, Defendant has received, and continues to hold, unlawfully obtained property and money belonging to Plaintiff and the Class in the form of payments made by Plaintiff and Class members for their Ultimate

Guitar Subscriptions.  Defendant has profited from its unlawful and/or unfair acts and practices in the amount of those business expenses and interest accrued thereon.

87.    Defendant's acts and omissions as alleged herein violate obligations imposed by statute, are substantially injurious to consumers, offend public policy, and are immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

88.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

89.    Defendant's acts, omissions, nondisclosures, and misleading statements as alleged herein were and are false, misleading, and/or likely to deceive the consuming public.

90.    Plaintiff and the members of the Class have suffered a substantial injury in fact and lost money by virtue of Defendant's acts of unfair competition, which caused them to purchase the Ultimate Guitar Subscriptions.  Had Defendant complied with its disclosure obligations under the ARL, Plaintiff and members of the Class would not have purchased their Ultimate Guitar Subscriptions or would have canceled their Ultimate Guitar Subscriptions prior to the renewal of the subscriptions, so as not to incur additional fees.  Thus, Plaintiff and members of the Class were damaged and have suffered economic injuries as a direct and proximate result of Defendant's unlawful and/or unfair business practices.

91.    Defendant's violations have continuing and adverse effects because Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this unlawful course of conduct.  The public and the Class are subject to ongoing harm because the unlawful and/or unfair business practices associated with the Ultimate Guitar Subscriptions are still used by Defendant today.

92.    Plaintiff and the Class seek restitution pursuant to Cal. Bus. & Prof. Code § 17203 of all amounts that Defendant charged or caused to be charged to Plaintiff's and the Class's Payment Methods in connection with their Ultimate Guitar Subscriptions during the four years preceding the filing of this Complaint.  Defendant should be required to disgorge all the profits and

1   gains it has reaped and restore such profits and gains to Plaintiff and the Class, from whom they

2   were unlawfully taken.

3       93.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and members of the Class

4   seek a court order enjoining Defendant from such future misconduct, and any other such orders

5   that may be necessary to rectify the unlawful business practices of Defendant.

6       94.     Plaintiff lacks an adequate remedy at law to address the unfair conduct at issue here.

7   Legal remedies available to Plaintiff and Class are inadequate because they are not equally prompt,

8   certain, and in other ways efficient as equitable relief. Damages are not equally certain as

9   restitution because the standard that governs restitution is different than the standard that governs

10  damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to

11  sufficiently adduce evidence to support an award of damages. Damages and restitution are not the

12  same amount. Unlike damages, restitution is not limited to the amount of money Defendant

13  wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles

14  Plaintiff to recover all profits from the wrongdoing, even where the original funds taken have

15  grown far greater than the legal rate of interest would recognize. Legal claims for damages are not

16  equally certain as restitution because claims under the UCL entail fewer elements. In short,

17  significant differences in proof and certainty establish that any potential legal claim cannot serve

18  as an adequate remedy at law.

19      95.     Equitable relief is also appropriate because Plaintiff may lack an adequate remedy

20  at law if, for instance, damages resulting from his purchase of the Ultimate Guitar Subscription are

21  determined to be an amount less than the total expenditure in connection with that subscription.

22  Without compensation for the full price of the Ultimate Guitar Subscription, Plaintiff would be left

23  without the parity in purchasing power to which he is entitled.

### COUNT II
**Conversion**

26      96.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the

27  preceding paragraphs as though alleged in this Count.

28

97.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

98.     As a result of charges made by Defendant to Plaintiff's and Class members' Payment Methods without authorization and in violation of California law, Defendant has taken money that belongs to Plaintiff and the Class.

99.     The amount of money wrongfully taken by Defendant is capable of identification.

100.     Defendant engaged in this conduct knowingly, willfully, and with oppression, fraud, and/or malice within the meaning of Cal. Civil Code § 3294(c).

101.     As a result of Defendant's actions, Plaintiff and the Class have suffered damages.

**COUNT III**
**Violations of California's False Advertising Law ("FAL"),**
**Cal. Bus. & Prof. Code §§ 17500, *et seq*.**

102.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

103.     Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

104.     California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state,  …in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

105.     Defendant committed acts of false advertising, as defined by § 17500, by intentionally making and disseminating statements to consumers in California and the general public concerning Defendant's products and services, as well as circumstances and facts connected to such products and services, which are untrue and misleading on their face and by omission, and which are known (or which by the exercise of reasonable care should be known) by Defendant to

be untrue or misleading.  Defendant has also intentionally made or disseminated such untrue or misleading statements and material omissions to consumers in California and to the public as part of a plan or scheme with intent not to sell those services as advertised.

106.    Defendant's statements include but are not limited to representations and omissions made to consumers before and after enrollment in Defendant's Ultimate Guitar Subscriptions regarding the terms of payment for and cancellation of a consumer's automatic payments. Defendant is silent with regard to the terms of its cancellation policy.  These omissions on the Checkout Page and the Acknowledgment Email constitute false and deceptive advertisements.

107.    Defendant's actions in violation of § 17500, as described herein, were false and misleading such that the general public is and was likely to be deceived.

108.    Plaintiff and the members of the Class were deceived by Defendant's statements and omissions made online when they signed up and started paying for their Ultimate Guitar Subscriptions, and there is a strong probability that other California consumers and members of the public were also or are likely to be deceived as well.  Any reasonable consumer would be misled by Defendant's false and misleading statements and material omissions.  Plaintiff and other members of the Class did not learn of Defendant's cancellation and automatic payment policies until after they had already signed up and started paying for Defendant's Ultimate Guitar Subscription.  They relied on Defendant's statements and omissions to their detriment.

109.    Plaintiff and the Class lost money or property as a result of Defendant's FAL violations because they would not have purchased the Ultimate Guitar Subscriptions on the same terms if the true facts were known about the product and the Ultimate Guitar Subscriptions do not have the characteristics as promised by Defendant.

110.    Plaintiff lacks an adequate remedy at law to address the unfair conduct at issue here. Legal remedies available to Plaintiff and Class are inadequate because they are not equally prompt, certain, and in other ways efficient as equitable relief. Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages. Damages and restitution are not the

same amount. Unlike damages, restitution is not limited to the amount of money Defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles Plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Legal claims for damages are not equally certain as restitution because claims under the FAL entail fewer elements. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

111.    Equitable relief is also appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Ultimate Guitar Subscription are determined to be an amount less than the total expenditure in connection with that subscription. Without compensation for the full price of the Ultimate Guitar Subscription, Plaintiff would be left without the parity in purchasing power to which he is entitled.

### COUNT IV
### Violations of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*

112.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

113.    Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

114.    Plaintiff and the members of the Class are "consumers" within the meaning of Cal. Civil Code § 1761(d) in that Plaintiff and the Class sought or acquired Defendant's goods and/or services for personal, family, or household purposes.

115.    Defendant's selection and/or subscription offers and the other products pertaining thereto are "goods" and/or "services" within the meaning of Cal. Civil Code § 1761(a) and (b). The purchases by Plaintiff and the Class are "transactions" within the meaning of Cal. Civil Code § 1761(e).

116.    The acts and practices of Defendant as described above were intended to deceive Plaintiff and the Class as described herein, and have resulted, and will result, in damages to

Plaintiff and the Class. These actions violated, and continue to violate, the CLRA in at least the following respects: (a) Defendant's acts and practices constitute representations or omissions deceiving that the Ultimate Guitar Subscriptions have characteristics, uses, and/or benefits, which they do not, in violation of Cal. Civil Code §1770(a)(5); and (b) Defendant's acts and practices constitute the advertisement of the goods in question without the intent to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9).

117. Plaintiff and the Class suffered economic injury as a direct result of Defendant's misrepresentations and/or omissions because they were induced to purchase Ultimate Guitar Subscriptions and/or pay renewal fees they would not have otherwise purchased and/or paid. Had Defendant fully and clearly disclosed the terms associated with the Ultimate Guitar Subscriptions, Plaintiff and the Class would not have subscribed to the Ultimate Guitar Subscriptions, or they would have canceled their Ultimate Guitar Subscriptions earlier, *i.e.*, prior to the expiration of the initial subscription period.

118. Plaintiff, on behalf of himself and all other members the Class, seeks an injunction prohibiting Defendant from continuing its unlawful practices in violation of the CLRA.

119. In compliance with the provisions of California Civil Code § 1782, Plaintiff sent written notice to Defendant on June 25, 2025, informing Defendant of his intention to seek damages under California Civil Code § 1750. The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom. The letter expressly stated that it was sent on behalf of Plaintiff and "all other persons similarly situated." Accordingly, if Defendant fails to take corrective action within 30 days of receipt of the demand letter, Plaintiff will amend his complaint to include a request for damages as permitted by Civil Code § 1782(d) for Defendant's violations of the CLRA.

**COUNV V**
**Unjust Enrichment / Restitution**

120.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

121.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

122.    Plaintiff and the Class conferred benefits on Defendant by purchasing the Ultimate Guitar Subscriptions.

123.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and the Class's purchases of the Ultimate Guitar Subscriptions.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant's failure to disclose material terms of the purchase agreement, in violation of California law, induced Plaintiff and the Class to purchase the Ultimate Guitar Subscriptions.  These omissions caused injuries to Plaintiff and the Class because they would not have purchased the Ultimate Guitar Subscriptions at all, or on the same terms, if the true facts were known.

124.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and the Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class for their unjust enrichment, as ordered by the Court.

**COUNT VI**
**Negligent Misrepresentation**

125.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

126.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

127.    As discussed above, Defendant omitted, failed to disclose, and intentionally concealed from its advertisements and related statements regarding the Ultimate Guitar Subscriptions material facts concerning billing, cancellation, and automatic payment terms, policies, and requirements.

128.    At the time Defendant made these representations, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

129.    At an absolute minimum, Defendant negligently misrepresented and/or negligently omitted material facts about the Ultimate Guitar Subscriptions and their associated terms.

130.    The negligent misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase and enroll in Defendant's Ultimate Guitar Subscription programs.

131.    Plaintiff and Class members would not have purchased the Ultimate Guitar Subscriptions if the true facts had been known.

132.    The negligent actions of Defendant caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT VII
### Fraud

133.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

134.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

135.    As discussed above, Defendant provided Plaintiff and Class members with false or misleading material information and failed to disclose material facts about the Ultimate Guitar Subscriptions and their associated automatic renewal terms, including terms regarding Defendant's cancellation policy and billing practices and policies.  These misrepresentations and omissions were made by Defendant with knowledge of their falsehood.

136.    The misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the Ultimate Guitar Subscriptions.

137.    The fraudulent actions of Defendant caused damage to Plaintiff and the members of the Class, who are entitled to damages and other legal and equitable relief as a result.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Steven Teilmann, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.    For an order certifying the Class and naming Plaintiff as a representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b.    For an order declaring Defendant's conduct violates the statutes referenced herein;

c.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

d.    For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.    For prejudgment interest on all amounts awarded;

f.    For an order of restitution and all other forms of equitable monetary relief;

g.    For injunctive relief as pleaded or as the Court may deem proper; and

h.    For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

### DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: June 25, 2025                    Respectfully submitted,

**GUCOVSCHI ROZENSHTEYN, PLLC.**

By:    _/s/ Adrian Gucovschi_
Adrian Gucovschi (State Bar No. 360988)
140 Broadway, Fl. 46
New York, NY 10005
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gr-firm.com

*Attorneys for Plaintiff*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Adrian Gucovschi, declare as follows:

1.    I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Gucovschi Rozenshteyn, PLLC, counsel of record for Plaintiff Steven Teilmann in this action.  Plaintiff Steven Teilmann alleges that he is a citizen of California who resides in San Fransico, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.    The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that Defendant Ultimate Guitar, Inc., regularly does business in the Northern District of California, and a substantial portion of the events alleged in the Complaint, including the same misrepresentations, omissions, and injures as alleged herein, have occurred in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Miami, Florida, this 25th day of June, 2025.

  _/s/ Adrian Gucovschi_
  Adrian Gucovschi